**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**


**TORRAE BROWN**                                                               **PLAINTIFF**


**VS.**                              **CASE NO. 3:19CV00013 PSH**


**NANCY A. BERRYHILL,  Acting Commissioner,**
**Social Security Administration**                                    **DEFENDANT**


**ORDER**

Plaintiff Torrae Brown ("Brown"), in his appeal of the final decision of the Commissioner

of the Social Security Administration (defendant "Berryhill") to deny his claim for Disability

Insurance benefits ("DIB"), contends the Administrative Law Judge ("ALJ") erred by: (1) failing

to acknowledge Brown's severe arthritis of the spine; (2) giving no evidentiary weight to the opinon

of Brown's treating physicians while giving controlling weight to the opinions of nonexamining

disability screeners; (3) failing to provide any limitations in standing, walking, or reaching in the

residual functional capacity ("RFC") assessment; and (4) failing to rely on substantial vocational

evidence to support the decision.  The parties have ably summarized the medical records and the

testimony given at the administrative hearings conducted on November 28, 2017, and July 24, 2018.[1]

(Tr. 23-50).  The Court has carefully reviewed the record to determine whether there is substantial

evidence in the administrative record to support Berryhill's decision.  42 U.S.C. § 405(g).  The

---

[1] The ALJ presiding over the initial administrative hearing retired prior to issuing a decision, and the
case was assigned to another ALJ, who chose to conduct an additional hearing.

1

relevant period under consideration is from Brown's amended onset date of May 13, 2015, through the date of the ALJ's decision, August 10, 2018.

*The Administrative Hearings:*

At the November 2017 hearing Brown stated he was 49 years old and had a twelfth grade education. Brown explained he worked for Federal Express from 2001 until January 2015, last working as an auditor from 2013-2015. He applied for retirement due to his last back spasm episode. Brown lived with his wife and twenty-three year old son. Brown cited neck and back pain radiating throughout his body as impediments preventing him from working. The pain, according to Brown, caused tingling in his hands, requiring him to use an electric razor, button only loose buttons, and keeping him from opening jars. Brown estimated he could stand 20 minutes, sit 20-30 minutes, walk 100 yards, and lift an empty pot. Around the house, Brown stated he could stir a pot, vacuum, rinse some dishes, but could not do the bending required to wash clothes. Others in his family tended to yardwork, and Brown said his wife shopped and he accompanied her but unloaded only the lighter items. Brown described tossing and turning, resulting in fitful sleep. Brown listed Gabapentin, Cyclobenzaprine, Naproxen, a TENS unit, heating pad, and lengthy hot showers as medications and treatments used to combat his impairments. According to Brown, side effects such as nausea, blurry vision, speaking problems, and gas, accompanied the medications. Dr. Bridgid Steele ("Steele") was identified as Brown's primary care physician. Brown also testified to receiving chiropractic care in the past, discontinued at the time of the hearing due to a "paperwork issue." (Tr. 54). An average day for Brown included alternating positions, stretching, and watching television. (Tr. 22-58).

At the second administrative hearing, on July 24, 2018, Brown's testimony mirrored the

earlier hearing in many regards.  He added that he did not have a driver's license because he had not

sought a new license following a DUI in 2013 and because neck pain and stiffness would interfere

with safe driving.  Brown also added that he attended several colleges after high school.  He also

described his departure from his last job in more detail, stating he had a "real bad muscle spasm"

in 2015 and was transported to the VA hospital.  He stated that a doctor told him, "You're getting

them [spasms] too often now, and you just can't do it anymore," and if he continued he was "going

to be in a wheelchair."  (Tr. 75).  Brown acknowledged an inpatient stint in rehab in 2015 to address

alcohol issues, and testified he had not had a drink since leaving rehab.  Brown stated "any time I

do anything . . . it causes a real terrible muscle spasm."  (Tr. 82).  He estimated he could walk for

5-10 minutes, and stand for 30 minutes, needing to change positions.  Brown said he did no

yardwork and little housework.[2]  He stated he might take a daily walk, and he went to church on

Sunday.  Brown reiterated his problems with tingling hands, hindering him from opening and

holding things, and he estimated it took a month to recover from a muscle spasm.  He listed

medications as Gabapentin, Naproxen, Cyclobenzaprine, and Amitriptyline, and stated he battled

the side effects (lethargy, gas, and memory problems) by varying the dosage intakes.  Brown again

identified Steele as his treating physician, indicating he saw her annually.  He also stated he saw a

chiropractor.  Brown stated that his rehab was court ordered following his September 2013 DUI.

He explained that he pled guilty to the DUI even though he was not drinking – instead Brown did

not know if "I was stunned or if I was hit with a billy club" and he was "pretty sure I had a

concussion, and I kept fading in and out" and was unconscious when found by the police.  (Tr. 100-

---

[2]

Early in the relevant period, in August 2015, Brown complained of sinus drainage after he mowed
the grass.  (Tr. 583).

101).

Daniel Lustic ("Lustic"), a vocational expert, assessed Brown's prior work as a safety trainer as skilled, light work, and his past work as a material handling supervisor as skilled, medium work. The ALJ posed a hypothetical question to Lustic, asking him to assume a worker of Brown's age, education, and experience during the relevant period who could perform the full range of light work with the following limitations: never climbing ladders, ropes, or scaffolds; never working at unprotected heights, near moving mechanical parts, or operating a motor vehicle ; and crawling and stooping occasionally. Lustic stated such a worker could perform Brown's past relevant job as a safety trainer, as well as the jobs of cashier, sales attendant, and ticket seller. The variables in the hypothetical question were altered in various ways. Since the ALJ ultimately decided Brown had the RFC to perform the full range of light work, the Court will not address these permutations on the initial hypothetical question posed to Lustic. (Tr. 102-110).

*The ALJ's Decision:*

In her August 10, 2018 decision, the ALJ determined Brown had the severe impairment of degenerative disc disease of the cervical and lumbar spine. The ALJ found the impairment did not meet the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. As previously noted, the ALJ assessed Brown to have the RFC to perform the full range of light work. Relying upon Lustic's testimony, the ALJ found Brown capable of performing his past relevant work as a safety trainer, as well as the jobs of cashier, sales attendant, and ticket seller. Therefore, the ALJ held Brown was not disabled at any time during the relevant period.

*Medical Evidence During the Relevant Period:*[3]

---
[3]

In the weeks prior to the onset date of May 13, 2015, Brown completed his in-patient rehabilitation

Brown was seen by Dr. Tyler Brolin ("Brolin") on June 20, 2015, at the Veterans Administration ("VA") Hospital in Memphis, Tennessee, for a compensation and pension examination. Brolin's findings regarding Brown's cervical spine included: normal range of motion; no objective evidence of localized tenderness or pain on palpation of the neck; pain, weakness, fatigability or incoordination does not significantly limit his functional ability with repeated use over a period of time; no localized tenderness, guarding, or muscle spasm of the cervical spine; normal strength (5/5) in elbow flexion, elbow extension, wrist flexion, wrist extension, finger flexion, and finger abduction; normal deep tendon reflexes in right and left triceps and brachioradialis; normal sensation to touch in shoulder area, decreased sensation to touch in inner/outer forearm, and normal sensation to touch in hand/fingers; no radicular pain or any other signs or symptoms due to radiculopathy; no functional impairment of an extremity due to a neck condition; the presence of arthritis on the imaging studies of the cervical spine; and no impact on Brown's ability to work due to his cervical spine condition.

Brolin also assessed Brown's back condition, finding: no flare-ups of the back; no report of functional loss or functional impairment by Brown; normal range of motion; the presence of localized tenderness or pain on palpation of the back; an ability to perform repetitive use testing of the back without loss of function or range of motion after three repetitions; pain, weakness, fatigability or incoordination does not significantly limit his functional ability with repeated use over

_____

program for alcohol dependence. (Tr. 377-521). Treating physicians in the program noted back and foot pain and requested both neurosurgery and podiatry consults. (Tr. 396-397). Cervical and lumbar MRI's were conducted on April 29, 2015. The cervical MRI showed "very minimal degenerative changes which may be slightly worse than a similar study from 7/3/07" and the lumbar MRI showed "minimal degenerative disc disease at L5-S1, but no stenosis in a patient with a large bony canal." (Tr. 580, 720-722, 747).

a period of time; no guarding or muscle spasm of the back; normal strength of hips, knee extension, ankle plantar flexion; ankle dorsification, and great toe extension; no muscle atrophy; normal knee and ankle deep tendon reflexes; normal sensation to light touch for upper anterior thigh, thigh/knee, lower leg/ankle, and foot/toes; negative straight leg raising tests; no radicular pain or any other signs or symptoms due to radiculopathy; no ankylosis; no other neurologic abnormalities related to a back condition; no intervertebral disc syndrom requiring bed rest; no arthritis documented from imaging studies; and no impact on Brown's ability to work due to his back condition.[4] (Tr. 589-607).

Brown was seen by Dr. Uzma Shirwany ("Shirwany") at the VA Hospital in Memphis in July of 2015. He complained of foot pain and tingling in left finger tips without weakness, and requested physical therapy for his neck and back. On physical examination, Shirwany noted mild tenderness in Brown's heel with no swelling, high cholesterol, and low vitamin D. Shirwany described Brown's spine condition as stable, directed that Gabapentin be tried for neuropathy, and referred Brown for physical therapy. Brown was directed to return in 12 months. (Tr. 584-587).

Brown reported for physical therapy on August 12 and 27, September 21, October 20 and 27, and November 2, 2015. (Tr. 582, 753-754, 579, 568-569, 556-557, 563-564). At his final session, the physical therapist noted he rode a stationary bicycle for 15 minutes with rest breaks, performed numerous stretches, did core stabilization exercises, and had cervical traction and heat therapy for 15 minutes. Brown reported no post treatment aggravation of pain. (Tr. 556-557).

In January 2016, a nonexamining state agency physician opined Brown could perform the

---

[4]

Brolin indicated his findings with regard to Brown's back were "medically inconsistent" with Brown's subjective statements. (Tr. 597). Brolin also examined Brown's feet, finding mild left calcaneal bursitis, with no functional impact on Brown's ability to perform any type of occupational task, such as standing, walking, lifting, or sitting. (Tr. 601-607).

full range of light work, noting mild degenerative disc disease with chronic pain. (Tr. 134-135).

In May 2016, Steele, a VA Hospital physician, signed a medical source statement assessing Brown's physical abilities. Steele diagnosed degenerative arthritis and disc disease spine, and opined that Brown could do the following: lift and carry occasionally or frequently less than 10 pounds; stand and walk about 2 hours in a work day, stand or walk 15 minutes before needing a break; sit about 4 hours in a work day, needing a break after 30 minutes; needing frequent rest periods, longer than normal breaks, and the opportunity to shift at will from sitting or standing/walking; unable to reach in all directions; able to finger one third of a work day; unable to handle; lethargic and dizzy from side effects from Gabapentin and Flexeril; must avoid all exposure to extreme cold and soldering fluxes; must avoid moderate exposure to extreme heat and high humidity; and must avoid concentrated exposure to fumes, odors, dust, gas, solvents/cleaners, and chemicals. Steele estimated Brown's impairments would result in him being absent from work more than 3 days a month. Steele wrote "see MRI" as an objective medical finding supporting her findings, and indicated Brown's limitations were in effect from September 22, 2014, through May 24, 2016. (Tr. 792-795). Steele notified Brown by mail a few days later that his recent spine "xray shows severe arthritis." (Tr. 795).

Dr. Donna E. Swain ("Swain"), a radiologist, examined an MRI of Brown's cervical spine taken on May 24, 2016, comparing the image with one taken in September 2014. Swain found there was "multilevel degenerative disc disease which extended from the level of C4-5 through C6-7 which is severe in nature and moderate in character at C3-4. C7-T1 disc space is not adequately visualized thought the alignment in normal. Prevertebral soft tissues is normal and odontoid is normal." (Tr. 799). Swain's impression was persistent severe multilevel degenerative disc disease

"which may be slightly more pronounced since 2014." (Tr. 799).

Another MRI of Brown's cervical spine was performed on August 24, 2016. Radiologist James B. Woods ("Woods") found there was no change from April 2015. Brown was described as having degenerative disc disease, and Woods found "some mild frontal stenosis at the exit of the right C5 nerve root. Clinical correlation is necessary." (Tr. 870). Steele contacted Brown and discussed the MRI results. Steele's note to the file described Brown as having chronic low back pain not better with exercises, stretches, TENS and meds. She recommended chiropractic care and physical therapy. (Tr. 889-890). An electromyography test, used to assess the health of the muscles and nerve cells, was also performed, and the results were normal. (Tr. 891).

Brown consulted with a VA physical therapist on September 8, 2016, reporting lumbar and cervical pain of 8/10. The treatment plan formulated for Brown included heat and ice, activity modification, active exercises to improve low back pain and range of motion, a heating pad and a home exercise program. On September 29, Brown reported to Steele that he experienced severe pain, tingling in his fingers, muscle spasms, and other symptoms after walking about a half mile per physical therapy recommendations. Brown asked for an alternative pain strategy. (Tr. 886). On November 9, Brown reported to Steele that the Gabapentin was giving him problems, and that he continued to have headaches, tingling in his hands, and muscle spasms. Steele responded, suggesting a change from Gabapentin to Lyrica. (Tr. 882).

Brown began chiropractic care in November 2016. Lawrence Nichols, D.C., ("Nichols") and Lincoln Joshua Cole, D.C., ("Cole") treated Brown. Nichols saw Brown seven times in November 2016, concluding on November 30 with Nichols recording "remarkable" improvement in increased joint range of motion, muscle strength in lower extremities, dermatome sensation patterns, and pain.

(Tr. 846-864, 866, 899). Cole treated Brown on ten occasions in November and December 2017 and January 2018. (Tr. 893-898, 920-925, 927-930). Brown's subjective complaints of neck and back pain were 8 or 9 on a scale of 1-10. At his final visit, Cole's objective findings included improvement from a rating of 40% to 61%. Cole noted Brown's prognosis was good, and found an increase in range of motion and muscle strength and a decrease in pain following the treatment. (Tr. 929).

The Court will now consider Brown's claims for relief.

**ALJ failure to acknowledge Brown's severe arthritis of the spine.**

Brown contends the ALJ erred by failing to acknowledge, at Step 2 of the sequential evaluation, that his severe arthritis of the spine was a severe impairment. The standard for finding a severe impairment is low. *Nicola v. Astrue*, 480 F.3d 885 (8th Cir. 2007). Brown bears the burden of showing he has a medically determinable impairment or combination of impairments that significantly limits his ability to perform basic work activities. *Kirby v. Astrue*, 500 F.3d 705 (8th Cir. 2007); 20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520 (c), and 404.1521(a). An impairment is not severe if it is only a "slight abnormality" that does not significantly limit the ability to do basic work activities. *Kirby v. Astrue* at 707. A diagnosis alone does not establish the existence of a severe impairment. *Perkins v. Astrue*, 648 F.3d 892 (8th Cir. 2011).

Brown argues that the ALJ discussed and found non-severe knee pain and carpal tunnel syndrome "but failed to even consider whether spinal arthritis was nonsevere." Docket entry no. 11, page 16. A review of the ALJ's decision belies this contention. After discussing Brown's knee problems and carpal tunnel syndrome, the ALJ noted Brown's allegation of disability "due to arthritis in his neck and back." (Tr. 13). The ALJ proceeded to address this issue, considering,

among other things, April 2015 MRIs of the cervical spine and lumbar spine showing minimal degenerative changes, an August 2016 MRI showing no change from 2015, and a normal nerve conduction study from June 2016. The ALJ also cited a lack of treatment by epidural injections, neurological evaluation, and prescription analgesic medications, and also improvement with chiropractic treatment, as items which were consistent with the absence of disabling spinal arthritis.

Substantial evidence supports the ALJ's finding that Brown's arthritis was not a severe impairment. Although he was diagnosed with severe arthritis, notably by Steele, the medical evidence cited by the ALJ amounts to substantial evidence in support of his finding. The ALJ's finding of a severe impairment of degenerative disc disease is an acknowledgment of Brown's back issues. Given the medical evidence before him, the ALJ was not compelled to find Brown's arthritis was a separate severe impairment. In addition, Brown's own testimony at the administrative hearings was that he retired due to muscle spasms and continued to deal with this impairment, not with arthritic pain.

There is no merit to Brown's first claim, as substantial evidence supports the ALJ's decision, even acknowledging the low standard to be met to demonstrate a severe impairment.

**ALJ error in giving no evidentiary weight to the opinion of Brown's treating physicians while giving controlling weight to the opinions of nonexamining disability screeners.**

Brown faults the ALJ for failing to give any evidentiary weight to Steele's medical source statement executed in May 2016. The ALJ addressed Steele's medical source statement, giving it "no evidentiary weight" due to it being inconsistent with Steele's treatment notes, the other medical evidence in the record, and in conflict with Brown's documented improvement. (Tr. 15). Brown frames his argument as an "either/or" scenario, where the ALJ allegedly rejected Steele's findings

10

and embraced the opinions of the nonexamining disability screeners. This mischaracterizes the findings of the ALJ. While the nonexamining disability screeners are cited, the ALJ did not exclusively rely upon them. Instead, the ALJ cites other treating physicians, imaging results, improvement with chiropractic care, and the episodic nature of the pain as supportive of his decision. For example, Brolin's thorough findings at the outset of the relevant period indicated Brown's neck and back impairments would not impact his ability to work. Brolin, like Steele, was a VA Hospital physician. In addition, another VA physician, Shirwany, described Brown's spine condition as stable, referred him for physical therapy, and directed he return in one year.

A treating physician's medical opinions are given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence. *See Choate v. Barnhart*, 457 F.3d 865 (8th Cir. 2006). Here, the ALJ properly discounted Steele's 2016 statement for the reasons stated above. Also, Steele's own treatment notes from August 2017 are at odds with the medical source statement, as she assessed Brown with nontender spine, negative straight leg raises, normal muscle bulk, and improving lower back pain with chiropractic care. *See Gates v. Commissioner, Social Security Administration*, 721 Fed.Appx. 575 (May 14, 2018). While a treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight, such an opinion may be discounted or even disregarded where other medical assessments are supported by better or more thorough medical evidence. *Fentress v. Berryhill*, 854 F.3d 1016 (8th Cir. 2017). Here, the ALJ's discounting of Steele's statement was supported by other medical assessments by treating physicians, and the decision was supported by substantial evidence.

Brown also faults the ALJ for failing to address the findings of Swain and Nichols. Swain,

a radiologist, found Brown to have "persistent severe multilevel degenerative disc disease" based upon her May 2016 review of images of the cervical spine. (Tr. 799). Swain's impression also was that Brown's disc disease "may be slightly more pronounced since 2014." (Tr. 799). Swain's findings are in conflict with the April 2015 imaging results (cervical MRI showed "very minimal degenerative changes which may be slightly worse than a similar study from 7/3/07" and the lumbar MRI showed "minimal degenerative disc disease at L5-S1, but no stenosis in a patient with a large bony canal.") and with the normal findings of Brolin in June 2015. The ALJ was not obligated to accept Swain's diagnosis to the exclusion of the other medical evidence of record.

Nichols, a chiropractor, assessed Brown in November 2016 with "severely decreased" range of motion in cervical lateral flexion and rotation and in lumbar flexion and rotation, cervical compression, and shoulder depression with upper extremity limitations. (Tr. 860-862). However, the impact of these findings is softened by Nichols' findings less than two weeks later that Brown's improvement was "remarkable" in numerous areas and his "prognosis remains favorable." (Tr. 899). Under these circumstances, substantial evidence supports the ALJ's weighing of the medical opinion evidence, including his treatment of Nichols' treatment notes.

There is no merit in the second argument of Brown.

**ALJ failure to provide any limitations in standing, walking, or reaching in the RFC.**

Brown next contends the ALJ's RFC determination was erroneous, alleging it should have included limitations on his ability to stand, walk, and reach, rather than finding he could perform the full range of light work. Reversal of the ALJ is not appropriate

"so long as the ALJ's decision falls within the 'available zone of choice.' " *Bradley v. Astrue,* 528 F.3d 1113, 1115 (8th Cir.2008) (quoting *Nicola v. Astrue,* 480 F.3d

885, 886 (8th Cir.2007)). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola,* 480 F.3d at 886). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart,* 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008).

The Court has already addressed the medical opinions of Steele, one of the treating VA physicians, and found the ALJ appropriately discounted her opinions because, among other things, they were at odds with other findings by VA physicians. *Gates v. Commissioner, Social Security Administration*, 721 Fed.Appx. 575 (May 14, 2018). Brown also cites his subjective complaints, such as pain reported to Nichols, as supportive of additional RFC limitations. However, Nichols' brief treatment period of chiropractic care, concluding with remarkable improvement, does not compel the result urged by Brown.

It "is the ALJ's responsibility to determine a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). Here, the ALJ was faced with medical evidence from various providers at the VA hospital and from two chiropractors. The evidence was capable of different interpretations. The best example of this is the findings of Brolin and Steele, two VA physicians who viewed Brown's capabilities in vastly different ways. The ALJ could make the assessment that he did, and substantial evidence supports his findings. The ALJ's ultimate RFC conclusion fell within the zone of choice.

**ALJ failure to rely on substantial vocational evidence to support the decision.**

Brown notes that the four jobs cited by Lustic all required the worker to perform light work.

Brown contends this was error because the hypothetical question did not capture all of his impairments. Specifically, he urges that he could not walk and stand and reach in all directions, as required by the cited jobs. This argument, in essence, is a challenge to the RFC determination reached by the ALJ. The Court has already addressed this assertion, finding substantial evidence supports that Brown could perform the full range of light work. As a result, the hypothetical question adequately captured his abilities. Brown also contends ALJ error regarding the alternate finding that he could perform other jobs in the national economy, such as ticket seller, cashier, and sales attendant. The Court need not address this argument. The ALJ's Step 4 finding that Brown could perform his past relevant work as a safety trainer is amply supported by the record, including Lustic's testimony which he indicated was consistent with the *Dictionary of Occupational Titles*. There is no merit to the final argument advanced by Brown.

In summary, substantial evidence supports the determinations reached by the ALJ. The Court is mindful that its task is not to review the record and arrive at an independent decision, nor is it to reverse if it finds some evidence to support a different conclusion. The test is whether substantial evidence supports the ALJ's decision. *See, e.g., Byes v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012). This test is satisfied in this case.

IT IS THEREFORE ORDERED that the final decision of Berryhill is affirmed and Brown's complaint is dismissed with prejudice.

IT IS SO ORDERED this 6th day of September, 2019.

_____
UNITED STATES MAGISTRATE JUDGE